## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | CASE NO.  3:11-CR-0054-SLB |
| | ) | |
| RICKY WALTER DENTON, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This case is presently pending before the court on the following Motions:

(1)  Motion to Stay of Sentence and Release Pending Appeal, (doc. 326);[1]

(2)  Motion for Modification of the Record, (doc. 339);

(3)  Motion for Court to Clarify the Ruling on Certain Documents to Clarify and Correct the Record for Appeal, (doc. 341);

(4)  Motion for Injunction Preventing S.A. Stokes and/or Det. Tim Vanderford From Contacting Witnesses Jonathan Todd and Hollie Todd, (doc. 369);

(5)  Motion for New Trial on Newly Discovered Evidence of Fraud and/or Obstruction of Justice by Government Agents, (doc. 370);

(6)  Motion for Indicative Ruling, (doc. 371);

(7)  Renewed Motion for a New Trial, (doc. 392);

(8)  Motion to Compel the Court to Rule on Renewed Motion for New Trial, (doc. 395);

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.  Citations to page numbers refer to page number assigned to the document in the court's electronic filing system.

(9)  Motion to to Amend and Supplement Previously Filed Renewed Motion for a New Trial, (doc. 396);

(10)  Motion to Amend the Renewed Motion for a New Trial – Amendment No.  2, (doc. 397); and

(11)  Motion for Order to Show Cause, (doc. 400).

For the reasons set forth below, the court finds these Motions are due to be denied.

## I. <u>MOTION TO STAY SENTENCE AND RELEASE PENDING APPEAL,</u> (doc. 326).

Citing Rule 8(c) of the Federal Rules of Appellate Procedure[2] and Rule 38(b) of the Rules of Criminal Procedure,[3] Denton asks the court to order him released from federal custody and remanded to state custody pending his appeal.  The court notes that Denton has exhausted his direct appeals and his conviction has been affirmed.  Therefore, this Motion, (doc. 326), is due to be denied as moot.

The court also notes that it has previously denied Denton's Motions for a detention hearing, for bond and/or for release pending judgment and appeal.  (*See* doc. 17 [denied by

---

[2]Rule 8(c) provides only that Fed. R. Crim. P. 38 "governs a stay in a criminal case." Fed. R. App. P. 8(c).

[3]Rule 38(b) provides:

(1)  Stay Granted.  If the defendant is released pending appeal, the court must stay a sentence of imprisonment.

(2)  Stay Denied; Place of Confinement.  If the defendant is not released pending appeal, the court may recommend to the Attorney General that the defendant be confined near the place of the trial or appeal for a period reasonably necessary to permit the defendant to assist in preparing the appeal.

Fed. R. Crim. P. 38(b)

stamp ruling dated May, 18, 2011]; doc. 137 [denied by stamp ruling dated July 20, 2011];

doc. 254 [denied by stamp ruling on January 24, 2012]; doc. 254 [denied by stamp ruling on

January 24, 2012]; doc. 275 [denied by stamp ruling on January 24, 2012].)  Thus, even if

this Motion was not moot, it would be denied because Denton's current request offers no

reason for the court to alter its previous rulings.

## II.  <u>MOTION FOR MODIFICATION OF THE RECORD,</u> (doc. 339).

Denton asks the court to order that certain documents and evidence be certified as part

of the record on appeal, citing Fed. R. App. P. 10(e)(1).  This Rule provides, "If any

difference arises about whether the record truly discloses what occurred in the district court,

the difference must be submitted to and settled by that court and the record conformed

accordingly."  Fed. R. App. P. 10(e)(1).  The court finds that the record of the instant action

submitted to the Eleventh Circuit Court of Appeals "truly disclose[d] what occurred in [this]

district court," *id*.; therefore, this Motion, (doc. 339), will be denied.

### III.  MOTION FOR COURT TO CLARIFY THE RULING ON CERTAIN DOCUMENTS TO CLARIFY AND CORRECT THE RECORD FOR APPEAL, (doc. 341).

In this Motion Denton asks the court to "clarify" its ruling on a number of motions and objections that he concedes the court addressed at his sentencing.[4]  (Doc. 341 at 1.)

These documents are listed as:

(1)  Doc. 325 – Objection to calculation of sentencing guideline
(2)  Doc. 326 – Motion for Stay
(3)  Doc. 322 – Motion to Reconsider Motion for New-Trial
(4)  Doc. 310 – Objection to/and Motion to Reconsider Issues to Dismiss Indictment
(5)  Doc. 311 – Objection (Not Being Provided Photo)
(6)  Doc. 312 – Objection
(7)  Doc. 313 – Objections and Motion to Reconsider
(8)  Doc. 314 – Objection
(9)  Doc. 308 – Motion to Reconsider
(10)  Doc. 310 – Objection
(11)  Doc. 320 – Motion fort Grand-Jury Transcript Made Part of Record

(Doc. 341 at 1-2.)

At the sentencing hearing, this court stated:

> THE COURT: Before I get to the objections, let me say this: You have a number of post-trial pending motions.  I have looked at every single one of them.  I think they are all, with the exception of one, due to be and will be denied on the record.

---

[4]The court notes that defendant's Objection for the Record to the Calculation of Sentencing Guideline Applied in Sentencing in this Matter, (doc. 325), and Motion for Stay of Sentence and Release Pending Appeal, (doc. 326), were filed after the sentencing hearing. The Motion to Stay, (doc. 326), is due to be denied for the reasons stated *supra*.  The Objection for the Record was noted in the appeal record.

The only one I am going to – Document 316 is a motion to unseal attachments to a previously-filed motion. I'm going to have my courtroom deputy check, and I think you have filed the documents that were sealed in other subsequent motions, so it doesn't matter. To the extent, if they are still sealed in Document 300, I am going to direct they be unsealed.

But I have carefully looked at every other pending motion, and there are many, and they're duplicative of ones you filed pretrial, during the trial, post trial, and they're all due to be denied, so I am going to deny them on the record.

Now, if I need argument, I am going to tell you. I will tell you when I need argument. Okay. Thank you. What did you want to say? I really don't need argument. I looked at every single pending motion.

. . .

DEFENDANT DENTON:  Some of them are objections I would like to have on the record. I have numerous objections.

THE COURT:  They are preserved. They're preserved for appeal. ***I am overruling the objections, and I am denying the motions***. If my rulings are in error – I don't think there's any need to address them. I feel like I've addressed substantively anything that needs to be addressed on these motions previously.

. . .

THE COURT:  I'm ruling, so it's preserved. You don't need to argue today to have them preserved.

(Doc. 354 at 3-7; *see also* Order [Stamp Ruling] of Feb. 17, 2012 [denying docs. 308, 310, 313, 320, 322].)

The court's decision to overrule defendant's pending objections and to deny his pending motions was clear. Therefore, defendant's Motion to Clarify, (doc. 341), will be denied.

5

## IV.   MOTION FOR INJUNCTION PREVENTING S.A. STOKES AND/OR DET. TIM VANDERFORD FROM CONTACTING WITNESSES JONATHAN TODD AND HOLLIE TODD, (Doc. 369).

Denton asks the court to enjoin Special Agent Stokes of the FBI and Lieutenant Vanderford of the Colbert County Sheriff's Department from contacting Jonathan Todd and Hollie Todd.  (Doc. 369.)  He states that the Todds "have admitted they where subjected to improper [influence] by these agents to [commit perjury] and to not afford the defendant interviews during the trial and [the agents have] use[d] [intimidation] to interfer[e] with the adversary fact finding process and the defendant has filed proper motions before the court concerning those acts and the agents should be prevented from other acts of [intimidation]." (*Id.*)

Denton has no standing to seek an injunction prohibiting Vanderford and/or Stokes from contacting the Todds.  *See Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976); *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Therefore, Denton's Motion to enjoin Vanderford and Stokes from contacting Jonathan Todd or Hollie Todd, (doc. 369), will be denied.

## V.   MOTION FOR NEW TRIAL ON NEWLY DISCOVERED EVIDENCE OF FRAUD AND/OR OBSTRUCTION OF JUSTICE BY GOVERNMENT AGENTS, (doc. 370).

Denton contends that he is entitled to a new trial based on "newly discovered evidence of fraud and obstruction of justice by government agents." (Doc. 370 at 1.)  In support of his Motion he contends:

    1.  "Key [witness] for the government has stepped forward and admitted [he was] improperly influenced and intimidated to [commit] acts of perjury by S.A. Stokes during the trial."  (*Id*. [citing *id*. at 4-9].)

    2.  "Key [witness] for the government has provided sworn statement[ ] that Det. Tim Vanderford intimidated [her] not to [participate] in the adversary fact finding process by giving the defendant court sanctioned interviews during the trial."  (*Id*. at 2 [citing *id*. at 10-13].)

Based on this newly-discovered evidence, Denton contends he is entitled to a new trial in the interest of judgment.  (*Id*. at 2-3.)

    The Eleventh Circuit has held:

    Rule 33 allows a defendant to file a motion for a new trial within 3 years after the verdict if the motion is based on "newly discovered evidence," or 14 days after the verdict if based on "other grounds."  Fed. R. Crim. P. 33(b).  The court may grant the motion "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  We have held that, to succeed on a Rule 33 motion based on newly discovered evidence, the defendant must establish that:

    (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

*United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003)(quotations omitted).  The defendant must satisfy all of these elements to warrant relief.  *United States v. Williams*, 816 F.2d 1527, 1530 (11th Cir. 1987).  We have noted that motions for a new trial based on newly discovered evidence "are highly disfavored . . . and should be granted only with great caution."  *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006)(en banc)(quotations omitted).

    "In ruling on a motion for new trial based upon newly discovered evidence, it is within the province of the trial court to consider the credibility of those individuals who give statements in support of the motion."  *United States v. Reed*, 887 F.2d 1398, 1404 n.12 (11th Cir. 1989).  Further, we have

held that, for newly discovered evidence to justify a new trial, "the evidence must be material and not merely cumulative or impeaching, and must be such that it will probably produce an acquittal." *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999).

The government's presentation of perjured testimony or failure to correct false evidence violates due process. *Giglio v. United States*, 405 U.S. 150, 153-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). In order to establish a *Giglio* violation, the defendant must show that "(1) the contested statements were actually false, (2) the statements were material, and (3) the prosecution knew that they were false." *United States v. Bailey*, 123 F.3d 1381, 1395 (11th Cir. 1997)(quotations omitted). In order to show that the contested statements were material, the defendant must demonstrate that "the false testimony could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001)(quotations omitted).

*United States v. Mitchell*, 569 Fed. Appx. 884, 885 (11th Cir. 2014).[5] A defendant is not entitled to an evidentiary hearing on a motion for new trial based on newly discovered evidence if "the acumen gained by a trial judge over the course of the proceedings makes her well qualified to rule on the basis of affidavits without a hearing." *United States v. Schlei*, 122 F.3d 944, 994 (11th Cir. 1997)(quoting *United States v. Hamilton*, 559 F.2d 1370, 1373-74 (5th Cir. 1977))(internal quotations omitted).

## A.  JONATHAN TODD

Jonathan Todd is Denton's son. (Doc. 352 at 126.) At trial, he testified that he was living with Denton and Hollie Anderson Todd in December 2009. (*Id.* at 127.) On

---

[5]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

December 16, 2009, the day before the bank robbery, he and Ms. Todd were in their bedroom and they heard a gunshot. (*Id*. at 131-32.) He went into the living room and saw Denton and James Wimberly; there was a gunshot hole in the wall. (*Id*. at 131-33.)

Shortly after the bank robbery, Jonathan Todd got a call from Wimberly, who said that Denton had left something at the car wash that he wanted Mr. Todd to get. (*Id*. at 139-40, 164.) Ms. Todd drove Mr. Todd to the carwash. (*Id*. at 141-42.) Wimberly told Jonathan Todd that he wanted him to get something out of the ditch behind the carwash. (*Id*. at 145, 161.) Mr. Todd retrieved a Tupperware container from the ditch and returned to the car. (*Id.*)

According to Mr. Todd, he and Ms. Todd went back to the apartment where he opened the Tupperware contained and found money inside. (*Id*. at 146.) He put all the money in a Crown Royal bag; he did not keep any of the money. (*Id*. at 146-47.) He then had Ms. Todd drive him to Walmart, where he gave the money to Wimberly. (*See id*. at 205.) Jonathan Todd testified that he was not charged with any crime related to the bank robbery. (*Id*. at 163.)

Later, Mr. Todd was picked up by the FBI and showed a videotape of the bank robbery. (*Id*. at 147.) He told Special Agent Stokes that the bank robber "kind of walked like [defendant]." (*Id*.) During trial, Jonathan Todd identified the specific movement on the videotape that he considered similar to his father's walk. (*Id*. at 162.)

After Denton was arrested, he was held in the Colbert County jail.  During this time he sent a letter, Government's Exhibit 36, to Jamie Todd, defendant's other son and Jonathan Todd's brother, to give to Jonathan Todd.  Jamie Todd gave this letter to Government agents and the FBI agent showed the letter to Jonathan Todd, who recognized his father's handwriting.  (*Id*. at 149, 153.)  With regard to this letter, Jonathan Todd testified as follows:

> Q.  . . . Can you look down at the part, Mr. Todd, where it says, "Anyway, you remember when you visited me at the county, you told me that they wanted you to identify my shoes or the guy that robbed the bank's shoes in the video as mine"?
>
> A.  Yes.
>
> Q.  And then he goes on to say, "Of course, we both know that is BS anyway.  Do you recall that I asked you what type shoes they were, and you told me, hell, pop, they were some old cheap shoes from Walmart, that you don't wear that stuff."
>
> Do you remember that?
>
> A.  No.
>
> Q.  Do you see that in the letter?
>
> A.  Yes.
>
> Q.  Did you ever have a conversation like that with your dad at the jail?
>
> A.  No.

(*Id*. at 154-55.)  Also, Jonathan Todd testified that, in the letter, defendant asked Jonathan and Hollie Todd to testify falsely regarding Wimberly's presence at their apartment the day before the bank robbery:

10

Q. . . . Do you see the part down there that begins, "Now, James told them that I shot him that day Hollie got mad and left the apartment when I shot the wall. Hollie gave a statement to that. I read them. She said I shot the wall. Now, James says I shot at him to make him scared, so he would drive a car for me to rob the bank. Now, tell Hollie this, and you know it, too, James wasn't" – underlined – "even at the apartment that day. Please tell the truth about that at trial."

Was James at the apartment that day or not when the wall was shot?

A. Yes.

Q. Okay. And so your dad is asking you to say something that's not true?

A. Yes.

(*Id*. at 155.)   Jonathan Todd also testified that an FBI agent had showed him other letters

written by Denton in which he said derogatory things about Jonathan Todd.. (*Id*. at 157.)

On cross examination, Jonathan Todd testified:

Q. [By defendant]  What I'm saying is did they [the FBI agents] give you letters I had wrote somebody else talking bad about you[6] and then give you those letters and say is that not true and then did that make you mad at me to say that, what's going on here today?

Did that influence you to maybe make you angry or whatever?

A. Angry, yes.

Q. Would it – was it influencing your decision – did it make you mad that day or –

_____

[6]During the trial, Denton argued that the FBI had shown Jonathan Todd a letter that Denton had written to someone other than Jonathan Todd in which he said Jonathan Todd was "a crack head." (Doc. 352 at 8.)  Defendant does not deny that he wrote such a letter.

11

A.  Yes.

Q.  Did it make you mad enough to want to do something to hurt me?

A.  No.

Q.  Would it make you mad enough to say I asked you to do something that I didn't do?

THE COURT:  What was your question?

Q.  He said I asked him to do something that wasn't true.  I was asking did that make him mad enough to do that.

A.  No.

(*Id*. at 157-58 [footnote added].)

Jonathan Todd testified that he was not promised anything by the Government in exchange for his testimony and he has not been charged with any crime based on "getting that money out of that ditch."  (*Id*. at 163.)

On May 10, 2012, Denton filed a Motion for New Trial based on newly discovered evidence in the form of Jonathan Todd's sworn answers to written questions, in which Todd stated:

(1)  Where you interviewed by S.A. Stokes of the F.B.I. concerning the bank robbery that happened on December 18th 2009[?]  *Yes*
.

(2)  Where you shown a video of the robbery during those interviews[?]  *Yes*

(3)  Where you under the influence of drugs and/or alcohol during these interviews[?]  *Yes*

12

(4)  During the interviews where you allowed to read Ricky Denton's [your father's] personal and private mail that was addressed to other people besides yourself[?]  *Yes*

(5)  Did the contents of that mail contain statements about you that [were] [inflammatory] and resulted in making you angry or hurt[?]  *Yes*

(6)  Did those letters influence your answers in the interviews[?]  *Yes*

(7)  Prior to or during the interview where you shown the video or the robbery[, d]id S.A. Stokes tell you or suggest to you in any way who the person robbing the bank was or who he thought it was[?]  (If so, please explain.)  *Yes.  He said we already know [it is] Ricky Denton, your daddy. S.A. Stokes said that he needed me to say it was Ricky Denton (my father).*

(8)  Did S.A. Stokes tell you if you did not identify the person in the video, you would be prosecuted for the crime yourself[?] (Please explain.)  *He said if I didn't cooperate that I would be charged with a felon having a bullet beside my bed and another charge mispresion [sic] of a felony.*

(9)  Did S.A. Stokes'[s] suggesting to you that the person in the video was your father influence you to say that the person in the video could possibly be your father[?]  *Yes*

(10)  Did S.A. Stokes convey to you directly or indirectly that unless you identified the person in the video as your father, you would be charged in the crime[?]  *Yes*

(11)  Did you say to S.A. Stokes that you where 100% sure the person in the video was your father?  (Please elaborate on your answer.)  *No.  I said if it were my father you could easily tell because he would have a bulge under his shirt.  I said the guy walked a little like my daddy but there[ ] was no certainty.*

(12)  Did you say the person in the video resembled your dad merely to stop S.A. Stokes from harassing you and stop the interview[?]  *Yes*

(13)  Due to the fact you conveyed to S.A. Stokes in anger and fear that the person in the video could be your father, [d]id you feel compelled to testify to that in the trial.  *Yes.*

(14)  In absence of the influence of drugs and alcohol, the emotional influence of what you read in your dad's private letters, the threat of being charged with the crime yourself and the influence of S.A. Stokes suggesting to you that the person in the video was Ricky Denton[, w]ould you have testified at the trial the person in the video was your father?  *No*

(15)  Did you identify any clothes the robber wore as belonging to your father to S. A. Stokes?  *No*

(16)  Did you identify the shoes the robber wore as belonging to your father?  *No.  They had a statement pretyped suggesting I did [identify the shoes] but I refused to sign [the statement] because it was a lie.*

(17 )  Did S.A. Stokes serve you with a subpoena to testify at the trial and tell you not to contact your father?  *Yes*

(18)  Was the testimony you gave at the trial of Ricky Denton affected by the pressure and improper influence placed on you by S.A. Stokes[?]  *Yes*

(19)  If you had a chance to testify again, would you testify differently? (Why?)  *Yes because I've been drug free and I believe my father was wrongly accused and convicted.*

(20)  Did S.A. Stokes attempt to get you to sign or adopt a pre-typed statement supposedly containing things you said in these interviews?  *Yes*

(21)  Did you sign or adopt this statement? (If no, please explain why?)  *No.  It was a lie.  My statements were not exact.*

(22)  Did you identify the robber in the video as your father due to the injury on his side?  *No.  I said if it were my dad you could tell by his injury. They said they couldn't tell because of the coat.*

(23)  Did you feel pressured to say the person in the video was your father by S.A. Stokes and detective Vanderhand [sic]?  *Yes.*

(Doc. 370 at 4-9.)

The court finds this "newly-discovered evidence" is not material and that there is no probability that this evidence would produce an acquittal. *See United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999). The court notes that Jonathan Todd testified that the man in the bank video walked like Denton; he did not testify that the man in the video was Denton. Moreover, the specific portion of the video that he specified looked like his father stepping indeed resembled Denton's manner of walking as observed by the court. Mr. Todd did not testify that Denton had clothing or shoes matching the clothing and shoes of the man in the video. He testified that he had not been charged with any crime and that he had not been promised anything in exchange for his testimony.[7] Any inference to the contrary is simply not credible, especially in light of Denton's prior attempts to have Jonathan Todd testify falsely regarding his shoes and Wimberly's presence in the apartment on December 16, 2009.

The court finds that the "newly discovered evidence" – Jonathan Todd's answers to written questions – is not material and would not have produced an acquittal. Therefore, Denton's Motion for a New Trial, (doc. 370), will be denied.

---

[7]The court notes that, based on his criminal history, Jonathan Todd could have been charged with being a felon in possession based on the gun in his apartment and that, based on his actions in retrieving the money from the ditch and giving it to Wimberly, he could have been charged as an accessory to the bank robbery.

15

**B. HOLLIE TODD**

At trial Hollie Todd testified that she was living with Jonathan Todd and his father, Denton, at the time of the bank robbery in December 2009. (Doc. 352 at 105-06.) On a number of occasions she saw Denton's gun, which she identified as the gun in the surveillance video from the bank robbery. (*Id*. at 108-10, 116-17.) She testified that the night before the bank robbery, while she and Jonathan were in their bedroom, she heard a gun shot. (*Id*. at 111.) When she left entered the living room following the shot, she saw Denton and Wimberly in the living room and she saw a gunshot hole in the wall by the front door. (*Id*.)

After the robbery, Ms. Todd drove Jonathan Todd to Denton's car wash. (*Id*. at 113-14. Mr. Todd got out of the car and was gone for 10-15 minutes. (*Id*. at 114.) When he came back, he was wet. (*Id*.) Thereafter, she drove Jonathan Todd to Walmart, where Hollie Todd saw James Wimberly walking into Walmart. (*Id*. at 114-15.) Jonathan Todd went into Walmart and came back to the car about 10-15 minutes later. (*Id*. at 115.)

On cross-examination, Hollie Todd testified that, after Denton was arrested, she had the apartment lease and utilities transferred to her name because Denton was two to three months behind in rent and utilities. (*Id*. at 120.) She testified that she had received an eviction notice and the utilities had been turned off. (*Id*.)

After she testified and before the Government rested, Denton requested an interview with Hollie Todd. (*See* doc. 353 at 7.) The court allowed Denton to interview Hollie Todd

16

but only if she agreed. (*Id.* at 8 ["I tell you what I'll do, I'll have my courtroom deputy tell her that you wish to talk to her, that the marshals will be present, that she is free to talk to you, but if she doesn't want to, she doesn't have to."]; *see also* doc. 352 at 7-8 [Asst. U.S. Attorney represented to the court that, prior to trial, Denton wrote letters to his sons and Sarah Cornelius, his girlfriend, asking them to come to the jail to meet with him and "they did not want to;" also, "They don't want anything to do with him," and "Some of them are very afraid of him"].) Ms. Todd refused to talk to Denton.

Denton has submitted "Questions presented to the person of Hollie Todd," which Hollie Todd answered as follows:

(1) [Were] you harassed by Special Agent Pat Stokes to give evidence against Ricky Denton in a bank robbery that occurred on December 18th 2001 [sic][?] *Yes and Sgt. Vanderford*

(2) [Were] you repeatedly picked-up by Detective Vanderhand [sic] and S.A. Stokes and taken to the police station for questioning about the robbery? *Yes, at least 4 times.*

(3) Did you get to the police station on your own free will to give information to the police concerning the robbery? *No. I was informed that I had no choice but to be there that first day otherwise they would come get me for questioning.*

(4) Did you get the impression from S.A. Stokes that he felt like Ricky Denton robbed the bank and that he was not merely a suspect in the robbery but a target of S.A. Stokes? *Yes*

(5) Did you leave town to avoid being harassed by S.A. Stokes? *Yes*

(6) Did S.A. Stokes show you pictures of what he [alleged] to be you at Walmart? *Yes*

17

(7)  Were these photo's purportedly taken when events connected to the bank robbery took place?  *They said that it was the same day that my husband and James were there.*

(8)  Did S.A. Stokes tell you that he had intercepted letters that Ricky Denton had written letters that threatened your life?  *Yes*

(9)  Did S.A. Stokes and/or Det. Vanderhand [sic] tell you that Ricky Denton was attempting to pay someone to hurt you or have you killed?  *They told me that Ricky was threatening to have a hit out on me and I needed to be careful and have no communication [with] Ricky and that they could protect me.*

(10)  Did S.A. Stokes try to get you to identify a gun used in the robbery as the one in Ricky Denton's House?  *Yes*

(11)  Did you ever see a hand gun in Ricky Denton's apartment?  *While I was in the room I heard a shot [and] my husband told me to stay put.  I later came out and Ricky was really upset about his girlfriend.  So I left.*

(12)  During the trial where you asked to give Mr. Denton an interview?  *Yes*

(13)  Did Detective Vanderford persuade you not to give Ricky Denton that interview?  *Yes*

(14)  If it had not been for Detective Vanderford's influence would you have given Ricky Denton an interview after you testified at the trial?  *Yes*

(15)  Did S.A. Stokes serve you with a subpoena and tell you not to contact Ricky Denton prior to the trial?  *Yes*

(16)  If had not been for Vanderford and S.A. Stokes influence would you have allowed Mr. Denton to interview you to prepare for trial?  *Yes*

(17)  Did S.A. Stokes attempt to get you to sign a statement that was not true?  *Yes.  In some of our paperwork my statements were obscured and not exact.*

(Doc. 370 at 10-13.)

The court finds this "newly-discovered evidence" is not material and that there is no probability that this evidence would produce an acquittal. *See United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999). Hollie Todd's answers do not indicate that she testified falsely at trial. The court finds her statement, regarding the fact that she would have given Denton an interview but for harassment, not credible. The court had the opportunity to observe Ms. Todd throughout these proceedings and the court's deputy specifically asked Ms. Todd if she was willing to meet with Denton, to which she said she did not wish to meet with Denton. Moreover, the court finds such an interview would have made no difference at trial.[8]

Therefore, Denton's Motion for New Trial based on newly discovered evidence – Hollie Todd's answers to written questions – will be denied.

## VI. <u>MOTION FOR INDICATIVE RULING,</u> (doc. 371).

Denton asks the court to issue an indicative ruling pursuant to Fed. R. App. P. 12.1(a) on his Motion for New Trial based on Newly Discovered Evidence. (Doc. 371.) Rule 12.1(a) stastes: "If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending, the movant

---

[8]The court notes that Denton has not denied making statements about trying to have Hollie Todd murdered and trying to have Jonathan Todd lie on the stand. From this evidence the court is left with a firm conviction that Denton's purpose of meeting with Ms. Todd was to threaten her and to have her lie on the stand.

must promptly notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue."  Fed. R. App. P. 12.1(a).

This Motion, (doc. 371), will be denied as moot because Denton's appeal is no longer pending.  Nevertheless, the court finds the Motion is without merit as his Motion for New Trial did not raise a substantial issue and is due to be denied.

## VII.  RENEWED MOTION FOR A NEW TRIAL, (doc. 392).

Denton has filed a Renewed Motion for New Trial in which he reasserts a number of grounds; for the reasons set forth below, this Motion is due to be dennied.

## A. THE GOVERNMENT SUPPRESSED [IMPEACHMENT] EVIDENCE OF DEALS AND INCENTIVES GIVEN TO KEY WITNESSES IN VIOLATION OF FEDERAL LAW.

Denton contends, "the Government suppressed [impeachment] evidence of deals and incentives given to key witnesses in violation of federal law."  (Doc. 392 at 12.)  In support of this claim, Denton alleges:

> 1.  [Jonathan T]odd now swears under penalty of perjury that he was told and was in the understanding that if he testified and implicated Denton in the bank robbery he would not be prosecuted in the crime.  He swears he was also told that weapons charges would be ignored.

> 2.  [Jonathan] Todd, Hollie Todd, Jamie Todd, and Sarah [Cornelius] now swear that they were [forbidden] to [communicate] with Denton before or during the trial.

> 3.  Hollie Todd now swears that S.A. [S]tokes and Sgt Vanderford prevented her from giving Denton a interview even after the court [sanctioned] the interview.

20

    4.  Hollie Todd, [Jonathan] Todd and Sarah [Cornelius] have been threatened and told they would be sorry if they [informed] Denton [of] the truth by S.A Stokes and Sgt. Vanderford.

    5.  Hollie Todd and Sarah [Cornelius] now admit that they testified at Denton's trial to avoid prosecution, and were in the understanding the testimony was a requirement for charges being dropped.

(Doc. 392 at 12-13.)  According to Denton this evidence was suppressed by the Government and was material as impeachment evidence.

As set forth above, Jonathan Todd testified that he was not charged with any crime and he was not promised anything in exchange for his testimony.  Also, Denton was allowed to talk to his sons, his daughter-in-law, and his girlfriend, but, except for Jamie Todd, none of these individuals was willing to talk with him.  (*See* doc. 351 at 85; doc. 353 at 7-8.)  No **credible** proof has been presented that defendant was denied access to any willing witness.  (*See* doc. 352 at 4-9,; doc. 353 at 7-8.)  Also, he has presented nothing to indicate that the witnesses' testimony would have been materially different than their testimony at trial if he had spoken with the witnesses before trial or that he was unfairly prejudiced.  Also, the court notes that Denton wrote letters to Jamie and Jonathan Todd in an attempt to get them and Hollie Todd to tell a story on the stand that was contrary to the truth.  (*See* Government Exhs. 36, 39; doc. 352 at 154-55, 253-55.)  Under the circumstances the court finds this ground for a new trial is due to be denied.

**B.    THE   GOVERNMENT   SUPPRESSED   EVIDENCE   OF   WITNESS INTIMIDATION DURING A KEY SUPPRESSION HEARING.**

Denton contends he "has uncovered new evidence that [d]emonstrates (1) [t]hat Hollie Todd was forced into the police [s]tation at least 5 times against her will and finally left town to avoid being [harassed] by Sgt. Vanderford[;] (2) [t]hat Hollie Todd was in another State when the search of Denton's apt. [t]ook place[; and] (3) [t]hat Hollie Todd was told not to communicate with Denton because he was trying to have her murdered." (Doc. 392 at 18.)

As set forth above, the court finds the "newly discovered evidence" regarding Hollie Todd's interaction with the FBI Special Agent Stokes and Detective Vanderford is not material.  Therefore, for the reasons set forth above, this ground for a new trial will be denied.

**C. THE GOVERNMENT SUPPRESSED THE FACT THAT S.A. STOKES AND SGT. VANDERFORD SOLICITED A FALSE IDENTIFICATION**

Denton contends that Stokes testified falsely to the grand jury regarding "(1) [Jonathan] Todd positively [i]dentified Denton as the robber in the Video[;] (2) [t]hat [Jonathan] Todd [i]dentified the [c]lothes and [s]hoes the robber wore as Denton's[;] and (3) [t]hat Hollie Todd identified the gun as belonging to Denton."[9]  (Doc. 392 at 23.)  He also

---

[9]The court does not find, based on the sworn statements of Jonathan and Hollie Todd that Stokes knowingly testified falsely during the grand jury proceedings.  Stokes testified that he interviewed Jonathan Todd, who identified the man in the bank video as his father by his clothing, the yellow hoodie, gloves, and tennis shoes with green trim, (doc. 392-2 at 30), and "his gait, the way he walks, extremely strange," (*id*. at 29).

contends that Stokes and Vanderford threatened Hollie and Jonathan with prosecution if they did not testify as identifying Denton and his clothing and gun in the bank video and/or if they communicated with Denton before or during the trial.  As set forth above, the court finds Hollie and Jonathan Todd's statements regarding threats from Stokes and Vanderford are not credible and are immaterial.

At trial Stokes did not testify that Jonathan Todd had identified his father's clothes as being the clothes of the bank robber or that he had identified the man in the video was his father.  Also, he did not testify that Hollie Todd had identified the gun in the video as belonging to Denton.  Yet, without this testimony from Stokes, the jury at trial found Denton guilty of all counts  beyond a reasonable doubt.  Therefore, the court finds Stokes's alleged false testimony before the grand jury was immaterial and did not prejudice Denton.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)("We hold that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."); *Anderson v. Secretary for Dept. of Corrections*, 462 F.3d 1319, 1328 (11th Cir. 2006)(citing *United States v. Mangual-Corchado*, 139 F.3d 34, 42 (1st Cir. 1998); *Talamante v. Romero*, 620 F.2d 784, 791 (10th Cir. 1980)); *see also United States v. Mechanik*, 475 U.S. 66, 67 (1986)("We believe that the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted.").

23

For these reasons Denton's Motion for a New Trial based on Stokes's grand jury testimony will be denied.

## D. GOVERNMENT SUPPRESSED FAVORABLE EVIDENCE FROM EYE WITNESS

Denton argues that the government refused to provide him contact information for Forrest Sims, an eye witness to the bank robber leaving the scene. (Doc. 392 at 28.) Specifically, Denton contends:

> The Government claimed that they had a witness to the robbery that [described] the Switch car used in the robbery as Denton's. Denton requested the contact information of that witness to interview him for possible exculpatory evidence. The Government refuse stating that this witness had no evidence that would be favorable to Denton.

(*Id*.)

The court notes that Denton knew the content of Sims's statement very early in this matter, although the court denied his motion to be provided his contact information before the time set forth in the court's scheduling order. (*See* doc. 362 at 44-45; *see also* doc. 170 [denied by stamp ruling on July 6, 2011].) The court finds Sims's contact information was not exculpatory nor material. Moreover, this ground is not based on newly discovered evidence and, therefore, was untimely filed. Fed. R. Crim. P. 33(b)(2).

Denton's Motion for New Trial on this ground will be denied.

## VIII. MOTION TO COMPEL THE COURT TO RULE ON RENEWED MOTION FOR NEW TRIAL, (doc. 395).

This Motion, (doc. 395), will be denied as moot.

24

## IX.  MOTION TO AMEND AND SUPPLEMENT
## PREVIOUSLY FILED RENEWED MOTION FOR A NEW TRIAL, (doc. 396).

Denton asks the court for  permission to amend his Renewed Motion for New Trial.

His proposed amendments are untimely.  Therefore, his Motion to Amend and Supplement

will be denied.

Nevertheless, as set forth below, these proposed amendments are without merit.

Denton contends that he was denied his right to compel witnesses in his favor by

Government intimidation of his witnesses.  (Doc. 396 at 2-3.)  He bases this claim on the fact

that witnesses refused to grant him interviews before or during trial.  (*Id*. at 3.)  He now

contends that Jamie Todd told him after the second day of trial that Stokes and Vanderford

had not allowed him to talk to Denton.  (*Id*.)  The court finds this fact not to be credible.

Based on testimony from the stand, the demeanor of these individuals as observed by

the court throughout these proceedings, as well as defendant's conduct and demeanor and his

letters to and about these witnesses, the court is convinced that any decision not to speak with

defendant before or during trial was the choice of these witnesses and not because of any

word or deed by Stokes or Vanderford.[10]  The testimony at trial supports an inference that

defendant wanted to speak with the witnesses for purposes of convincing these individuals

to lie on the stand.  (*See* Government Exhs. 36, 39; doc. 352 at 154-55, 253-55.)  But,

---

[10]Defendant has never denied writing that he wanted Hollie Todd murdered or that he disowned Jonathan Todd.  Moreover, he has argued to the court that Hollie and Jonathan Todd conspired with Wimberly to rob the bank.  (*See* doc. 397 at 6.)

regardless of Denton's motivation for wanting to interview these witnesses. the court finds he has not established he was prejudiced in any way. The court finds no probability that the result of his trial would have been different but for his failure to interview these witnesses before or during trial.

Denton also argues that two witnesses, Alison Stutts and Christine Sutton, did not appear for trial because they were intimidated by the government or their subpoenas were never served. (Doc. 396 at 5.) This court has already addressed the issue of subpoenas Denton contends were never served. (*See* doc. 302 at 3.) Also, at the beginning of his trial, Denton told the court that Alison Stutts had not been served because she could not be found. (Doc. 351 at 10.) On the morning of the second day trial, Denton inquired about having his landlady, Christine Sutton, testify out of order as to the fact he had "worked out [his] rent" for the purpose of proving he "had everything under control," contrary to the Government's evidence of his need for money at the time of the bank robbery. (Doc. 352 at 4-5.) Ms. Sutton was not present for trial; however, the reason is not evident from the record.[11] It is noted on the record that Mrs. Sutton in not present; however, there was no discussion on the record that Sutton's subpoena was cancelled. After the Government rests, Denton calls only one witness, Special Agent Stokes, in his case in chief. The court finds no credible evidence that either Stutts or Sutton failed to appear and testify on defendant's behalf because of

---

[11]The court notes that Denton has repeatedly accused his standby counsel of cancelling Ms. Sutton's subpoena.   (*See* doc. 242 at 2; doc. 248 at 4; 274 at 7; doc. 274-2 at 10, 17.)

Government intimidation or influence.  Moreover the court finds that defendant has not demonstrated that their failure to testify prejudiced his defense or that their testimony was material.

Based on the foregoing, Denton's Motion to Amend and Supplement Previously filed Renewed Motion for a New Trial, (doc. 396), will be denied.

## X.  MOTION TO AMEND THE RENEWED MOTION FOR A NEW TRIAL, (doc. 397).

Denton moves the court to allow him to amend his Renewed Motion for New Trial. The proposed amendments are not based on newly discovered evidence and therefore, are untimely filed.  *See* Fed. R. Crim. P. 33(b)(2) ("Any motion for a new trial grounded on any reason *other than newly discovered evidence* must be filed within 14 days after the verdict or finding of guilty." (emphasis added)).  Therefore, Denton's additional grounds for a new trial are untimely filed.

Moreover, as set forth below, the court finds that Denton's proposed amendments are without merit.

## A.  AMENDMENT #1 – ADDITIONAL FACTS TO CLARIFY THE ISSUES AND BETTER SERVE THE COURT, (doc. 397 at 1).

The court finds no need to clarifying the issues with additional facts.  All "facts" relied upon by the court are found in the record of these proceedings and not defendant's unsworn conclusory facts.  Therefore, the Motion to Amend, (doc. 397), will be denied on this ground.

27

## B.   AMENDMENT #2 – NEWLY DISCOVERED BRADY AND GIGLIO VIOLATIONS, (doc. 397 at 5).

### 1.  Bullet Found in Second Search

Denton contends that the Government suppressed the fact that they recovered a bullet during the second search of the apartment.  This contention is without merit.  On June 14, 2011, at a hearing on defendant's Motion to Suppress, Denton specially questioned Stokes about the inventory form of the second search showing that bullet was found during the second search.  (Doc. 172 at 56.)  Obviously, if Denton had the inventory from the second search showing a bullet was recovered, the fact that the bullet was found in the second search was not suppressed.  *See Downs v. Secretary, Florida Dept. of Corrections*, 738 F.3d 240, 259-60 (11th Cir. 2013).

Therefore, the Motion to Amend, (doc. 397), will be denied on this ground.

### 2.  Photo of Robber's Face, (doc. 397 at 7).

Denton contends that the Government has an enhanced photograph of the man in the bank video that they have refused to produce.  This issue has been raised and denied on a number of occasions.  (*See* doc. 362 at 22-23; doc. 354 at 6-7.)  Suffice it to say, the video of the bank robbery shows the man, the court now knows as Denton, approach the bank. Before going inside, the man pulls the ski mask over his face.  Although the man in the video cannot be identified as Denton from the still shots of this moment, the still photographs are sufficient to show the man in the ski mask is clean-shaven.  James Wimberly and Jonathan Todd – both of whom Denton has tried to blame for the robbery – had facial hair at that time.

28

Throughout the proceedings, Denton has had the photographs that the Government had. (*See* doc. 354 at 6-7; doc. 362 at 22-23.)

Therefore, the Motion to Amend, (doc. 397), will be denied on this ground.

### 3. Two Witnesses said Denton's Gun was Black, (doc. 397 at 8).

Denton has asked to amend his Renewed Motion for New Trial to include a claim that the Government suppressed evidence that Sarah Cornelius and Jamie Todd had said that Denton's gun was black. Sarah Cornelius testified at trial that Denton had a "dark colored gun" with "white grips." (Doc. 352 at 234.) Jamie Todd testified that he owned a black gun. (*Id*. at 249-50.) Denton's attempt to raise a *Brady* issue based on this testimony that the Government allegedly did not disclose comes too late. Fed. R. Crim. P. 33(b)(2). The court will not entertain new issues raised by way of an amendment.

Also, defendant is not entitled to any relief based on this so-called *Brady* violation. The "suppressed" evidence was heard by the jury, and the jury voted to conviction defendant on both counts. Therefore, the court finds the testimony regarding black guns is immaterial.

Therefore, the Motion to Amend, (doc. 397), will be denied on this ground.

### 4. Jamie Todd's Letters, (doc. 397 at 10).

Denton contends the Government suppressed the fact that "the FBI solicited and requested copies of letters Denton wrote his son a defense witness and then misrepresented the facts to the court to get evidence to the jury." (Doc. 397 at 10.) At trial, Jamie Todd testified that Government agents had come to his house to serve him a subpoena. (Doc. 352

29

at 267.)  While they were there, Jaime Todd asked the agents if he could get defendant pictures of guns for use at trial, as Denton had requested in a letter, and he showed the agents the letter.  (*Id*.)  At that time, the agents asked Jamie for a copy of the letters.  (*Id*.)  The agents made copies of the letters and took the originals.  (*Id*. at 252.)  Nothing in the record indicates that the letters sent to Jamie Todd were not letters written by his father or that the Government altered the letters in any way.  The court finds the fact allegedly suppressed by the Government – that the Government agents asked Jamie Todd for the letters – is immaterial in any way.

Therefore, the Motion to Amend, (doc. 397), will be denied on this ground.

## C.  CUMULATIVE EFFECT OF BRADY VIOLATIONS, (doc. 397 at 12).

The court finds no *Brady* violations; therefore, Denton's claim that the cumulative effect of all the *Brady* violations warrants a new trial is without merit.  Therefore, the Motion to Amend, (doc. 397), will be denied on this ground.

## XI.  MOTION FOR ORDER TO SHOW CAUSE, (doc. 400).

Denton asks the court to order the Government "to answer his motion for a new trial and to show cause why he should not be granted a new trial."  (Doc. 400 at 1.)  The court finds no cause to require the Government to respond to Denton's numerous, meritless motions.  Therefore this Motion will be denied.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant's Motions are due to be denied.  An Order denying defendant's Motion to Stay of Sentence and Release Pending Appeal, (doc. 326); his Motion for Modification of the Record, (doc. 339); his Motion for Court to Clarify the Ruling on Certain Documents to Clarify and Correct the Record for Appeal, (doc. 341); his Motion for Injunction Preventing S.A. Stokes and/or Det. Tim Vanderford From Contacting Witnesses Jonathan Todd and Hollie Todd, (doc. 369); his Motion for New Trial on Newly Discovered Evidence of Fraud and/or Obstruction of Justice by Government Agents, (doc. 370); his Motion for Indicative Ruling, (doc. 371); his Renewed Motion for a New Trial, (doc. 392); his Motion to Compel the Court to Rule on Renewed Motion for New Trial, (doc. 395); his Motion to Amend and Supplement Previously Filed Renewed Motion for a New Trial, (doc. 396); his Motion to Amend the Renewed Motion for a New Trial – Amendment No. 2, (doc. 397); and his Motion for Order to Show Cause, (doc. 400), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 27th day of February, 2015.

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE